IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| ELDECO, INC., | ) | C.A. No. 3:08-2295-CMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **OPINION AND ORDER** |
| | ) | **GRANTING, IN PART, MOTION** |
| LPS CONSTRUCTION COMPANY and | ) | **FOR SUMMARY JUDGMENT** |
| XL SPECIALTY INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Through this action, Plaintiff, Eldeco, Inc., ("Eldeco"), seeks recovery for sums allegedly due under a subcontract entered between Eldeco and Defendant LPS Construction Company ("LPS") relating to construction of the Alvin S. Glenn Detention Center ("the Project"). LPS was the prime contractor on the Project. Defendant XL Specialty Insurance Company ("XL Insurance") provided a labor and material payment bond in favor of subcontractors such as Eldeco.

The sums sought fall into two categories: (1) amounts claimed for work performed; and (2) amounts claimed for extended field overhead costs ("EFOC"). Both categories are pursued under a contract theory. The claim for EFOC is also pursued under a *quantum meruit* theory.

The matter is before the court on Defendants' motion for summary judgment. For the reasons set forth below, the motion is granted in part and denied in part.

**STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either

the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). The non-moving party cannot create a genuine issue of material fact by presenting his or her own conflicting versions of events. *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.").

**FACTS**

On or about June 24, 2003, Richland County, South Carolina ("Owner") entered a contract with LPS to construct the Project ("the Prime Contract"). Dkt. Nos. 49-6, 49-7. On June 17, 2003, shortly prior to execution of the Prime Contract, LPS and Eldeco entered a subcontract for electrical

work ("the Subcontract"). Dkt. No. 49-8 at 1-29. The Subcontract was the result of substantial negotiations which resulted in modifications to the standard subcontract used by LPS. Those modifications are set out in a rider which became a part of the Subcontract ("the Rider"). *Id.* at 31-37. In addition, the Subcontract incorporated the Prime Contract and other defined "Contract Documents."[1] *Id.* at 1 (Subcontract, Art. 1), 31 (Rider at no. 2).

The original amount to be paid under the Subcontract was $2,313,000.00. *Id.* at 12 (Art. 18). That sum was increased to $2,458,586.76 by the execution of six (6) change orders during the course of performance of the work.[2] Eldeco's representative has conceded receipt of that amount, some portion of which was apparently paid by XL Insurance after commencement of this action.[3]

Under the original schedule, work on the Project should have commenced on June 2, 2003,

---

[1] The terms of the Subcontract on which the parties rely or to which they refer are set forth in the Discussion section of this order. All provisions quoted in this order reflect the language as modified by the Rider.

[2] The record reflects five fully executed change orders which, collectively, increase the contract price to $2,415,557.30. *E.g.*, Dkt. No. 49-10 at 30 (Change Order No. 5). A sixth change order which would bring the total to $2,458,586.76 is signed only by Eldeco's representative, Richard Zeron ("Zeron"). *Id.* at 13 (Change Order No. 6 dated March 4, 2007). Nonetheless, LPS's project manager and vice president, Terry Fletcher ("Fletcher"), concedes the validity of this change order through his affidavit. Dkt. No. 49-12 ¶¶ 2, 5 (stating that "LPS executed six change orders with Eldeco that changed the subcontract sum to $2,458,586.76"). In addition, Eldeco has admitted that $2,458,586.76 is the total amount set by change order. Dkt. No. 49-3 (responses to requests numbered 12, 31-33, 36-37).

[3] These concessions were made in multiple responses to requests for admission as well as through the deposition of Eldeco's Rule 30(b)(6) representative, Richard Zeron. Dkt. No. 49-3 (responses to requests numbered 12, 31-33, 36-37); Dkt. No. 49-4 at 29-30 (Zeron dep.). LPS's representative, Fletcher, likewise, avers that LPS has paid Eldeco $2,458,586.76 under the contract as modified by the change orders. Dkt. No. 49-12 ¶ 6. Plaintiff, nonetheless, maintains that there is still an amount of $16,956.68 due on the contract. In support of this claim, Plaintiff relies on a single unverified interrogatory response. Dkt. No. 49-11 at 9 (response to interrogatory no. 13). That response offers no explanation of the source or basis for the claim that this amount is owed under the contract terms. No other evidence (such as an affidavit) is offered in support of this claim or in explanation of how this claim would not be contradicted by the other discovery referenced above (responses to requests for admission and Zeron deposition testimony).

3

with "Substantial Completion" by January 7, 2005, a total of approximately nineteen months. Dkt. No. 49-9 at 3-4. Work on the Project did not, however, commence as early as planned, resulting in an initial extension of the Substantial Completion date to March 4, 2005.[4] *See, e.g.,* Dkt. No. 49-9 at 5 (Change Order No. 1, relying on delay in receipt of building permit). Later extensions were also granted, the latest such extension reflecting a revised Substantial Completion date of April 18, 2005. *See* Dkt. No.49-9 at 41 (Change Order No. 12 or 13);[5] *see also* Fletcher aff. ¶ 7 (noting that the Owner "granted LPS extensions on the Project substantial completion date" but not indicating what date was the final date ultimately approved).

The Project was not, however, substantially completed until at least August 24, 2007. *See* Dkt. No. 49-4 at 48 (Zeron dep. indicating that Eldeco demobilized on this date). Thus, the actual completion date, at least from Eldeco's standpoint, was roughly nineteen months after the Substantial Completion deadline reflected in the original contract and sixteen months after the latest modified Substantial Completion deadline for which evidence of a change order has been presented. There is no evidence that any of the delays in completion were caused by or attributable to Eldeco. *See generally* Fletcher aff. ¶ 5 ("Eldeco did not request any time extensions on the Project.").

---

[4] Although the parties agree that the contract start date was delayed, neither has presented the court with evidence as to the length of this delay other than as suggested by Change Order No. 1. Thus, while the delayed start date may have reduced Eldeco's costs (for example, by delaying when it needed to place resources on site), there is no evidence as to the amount of such reduction (which might arguably be offset against later costs) and certainly no evidence that the delay in start and actual substantial completion are the same.

[5] The copy of the change order which Defendants provided to the court is nearly illegible and the change order number cannot be made out. The April 18, 2005 Substantial Completion Date is, however, legible, as are the dates of signing which range from June 16, 2005, through June 27, 2005, all of which are well after the date shown on the same form as the substantial completion date (April 18, 2005). Another change order issued the same day indicates an even earlier authorized substantial completion date. Dkt. No. 49-9 at 37 (indicating a March 28, 2005 substantial completion date).

Early in 2005, Eldeco began communicating with LPS regarding Eldeco's claim for extended field overhead costs ("EFOC").[6] *E.g.*, Dkt. No. 49-12 (Fletcher aff. ¶ 8). These communications are evidenced, for example, by a letter dated March 8, 2005, through which Eldeco's representative, Zeron, forwarded documents to LPS's representative, Fletcher. This letter states, in part, as follows:

> The attached field overhead costs reflect Eldeco, Inc.['s] cost on a daily basis, LPS is responsible for that cost on a daily basis for each day the project extends past the project scheduled completion date.
>
> As this cost is and has been expensive to Eldeco, Inc. we would expect the appropriate change order to cover costs to date prior to re-mobilizing on this project site.

Dkt. No. 49-10 at 23 (also referring to an earlier letter dated February 3, 2005, which has not been provided to the court). The record also contains a letter from Zeron to Fletcher dated August 1, 2005, which provides an EFOC estimate of $93,074.20 for costs incurred between January 1, 2005 (slightly before the originally scheduled Substantial Completion date) and June 30, 2005. Dkt. No. 51-6. The letter refers to earlier conversations regarding the same topic. It does not threaten any specific repercussion for non-payment. *Id.*

On January 19, 2006, Fletcher wrote to Zeron stating that LPD had "reviewed with XL Insurance Co. your recent correspondence regarding extended overhead costs" and stating that XL had "suggested we immediately schedule a meeting with representatives from your firm to begin negotiations." Dkt. No 49-10 at 29. After suggesting a date for the meeting, the letter states as follows:

> However, LPS Construction Co., Inc. expects you Eldeco to fulfill their commitment to have electrician[s] on-site Monday January 23, 2006. Failure to meet this schedule will have serious consequences to LPS Construction Co., Inc. and other subcontractors.

---

[6] The parties sometimes refer to this claim as EFOH.

5

> Eldeco has performed their duties satisfactorily up to this date and XL Insurance and LPS Construction Co., Inc. want your firm to be treated fairly. However, LPS Construction Co., Inc. will not allow Eldeco to attempt to disrupt completion of the project at this time.
>
> We await your reply.

Dkt. No. 49-10 at 29.

On February 14, 2006, the parties executed Change Order No. 5, adding $46,537.00 to the sum due under the contract. The "Description of Change" section of this change order reads as follows:

> This change order is a temporary settlement between LPS Construction Co., Inc. and Eldeco, Inc., for extended overhead and general conditions. Eldeco and its subcontractors are to now efficiently proceed with the completion of the project. The balance of Eldeco's claim will be resolved when the project is complete. Terms and conditions of this settlement are to be considered confidential.

Dkt. No. 49-10 at 30 (dated February 13, 2006 and signed by Zeron and Fletcher on February 14, 2006); Dkt. No. 49-10 at 10 (clearer copy signed only by Zeron). There is no indication in this change order either of the total amount of the demand or the period covered by the "temporary settlement." The amount agreed to as a temporary settlement was added to the previous total "Contract Sum" and resulted in a "New Contract Sum Including This Change Order" of $2,415,557.30.

As arguably suggested by the language of LPS's letter and Change Order No. 5, Eldeco threatened to abandon its work and leave the Project around the time Change Order No. 5 was executed. Whether this threat related to the EFOC claim or other payment disputes is, however, in dispute.[7]

---

[7] LPS maintains that Eldeco threatened to stop work and leave the job site if LPS did not pay Eldeco's EFOC claim. *See* Dkt. 49-12 (Fletcher aff. ¶¶ 10-12); *see also* Dkt No. 51-9 at 5 (Fletcher

6

On March 28, 2006, Zeron signed a lien waiver on behalf of Eldeco. Dkt. No. 49-10 at 37.

The waiver reads, in part, as follows:

> Upon receipt of the sum of $88,195.49, the mechanic and/or materialman waives and releases any and all liens or claims of liens or any right against any labor and/or material bond it has upon the foregoing property through the period ending _____ and excepting those rights and liens that the mechanic and/or materialman might have in any retained amounts, on account of labor or materials, or both, furnished by the undersigned to or on account of said contractor for said building or premises.

*Id.* No date is filled in the blank. In addition to this waiver of liens/claims of liens and bonds, the waiver states that the signatory intends, through this waiver and release, to:

> release, discharge, and acquit LPS Construction Company, Inc. and XL Insurance . . . from any and all claims, . . . which arise out of or are in any way [related] to any bonds, contracts, subcontracts, or written or oral representations related to the [Project];
>
> release any and all claims under the labor and material payment bond and the performance bond . . . issued by XL Insurance for the [Project];
>
> assign to XL Insurance all claims , chooses [sic] in action, causes of action and rights arising in contract, tort, or otherwise that the undersigned has or may have against LPS Construction Company, Inc. related to the [Project].

Dkt. No. 49-10 at 37.

Eldeco continued work for a substantial period after execution of Change Order No. 5 and the March 28, 2006 waiver. Additional financial issues arose during that period. These issues are evidenced, in part, by a February 2, 2007 letter in which LPS's representative wrote to the Owner's representative noting several concerns, one of which involved a change in wiring of cameras which

---

dep. at 40) (stating Eldeco's threat to pull off the project was because of "payment" but not indicating specifically what payments were at issue). Eldeco concedes that it threatened to leave work at some point for lack of payment when LPS had received money from the Owner but had not paid Eldeco and may also have referenced the non-payment of EFOC as an additional reason. Dkt. No. 49-4 at 41-42 (Zeron dep. at 90-91). Eldeco also concedes that it did pull off the job on several occasions, but maintains that it only pulled off the job when there was no work to be done. *Id.*

7

LPS indicated might delay the job further and add to the electrical (Eldeco's) subcontract costs. The second issue related to the withholding of retainage on aspects of the Project which were satisfactorily completed. As to this issue, LPS indicated it was willing to have the Owner issue checks jointly to the contractor and subcontractor.

LPS's February 2, 2007 letter also noted that Eldeco had stated it was "considering pulling off the job when Area 6 is complete if this issue is not resolved." There is no indication in the letter or elsewhere in the record that LPS viewed Eldeco's position as unreasonable. Instead, the letter concludes by asking for "assistance . . . so the project can be completed as soon as possible" but warning "that LPS Construction Co., Inc. and our subcontractors will not be liable for any damages due to these delays." Dkt. No. 29-10 at 31-32; *see also* Dkt. No. 49-10 at 36 (Eldeco letter stating that it will have accomplished all available installation by June 1, 2007, will demobilize at that point, needs two weeks notice and payment of retainage prior to returning to the job site, and expects the Owner to pay costs of demobilizing and remobilizing).

Roughly a month after this letter was written, Eldeco's representative executed the sixth change order (discussed *supra* at n.2) which adds $43,029.46 to the Subcontract sum for a total of $2,458,586.76. This change order, which is dated March 4, 2007, and was signed by Zeron on March 9, 2007, contains the exact same "Description of Change" as found in Change Order No. 5, including the statement that "[t]he balance of Eldeco's claim [for EFOC] will be resolved when the project is complete." Dkt. No. 49-10 at 13. LPS (or XL Insurance on LPS's behalf) has paid this amount. In addition, LPS's representative, Fletcher, has conceded the validity of this change order. *See supra* n.2.

In June 2007, LPS wrote to the Owner's representative stating that "the owner's failure to release retainage continues to threaten completion of the project." Dkt. No. 49-10 at 33. This letter

8

states that it is attaching two letters from Eldeco stating its "frustration and . . . possible action" in response to the retainage situation. *Id.* [8]

The Project was ultimately completed, at least from Eldeco's perspective, on or about August 24, 2007, which is the date of Eldeco's final demobilization. After that date, Eldeco submitted a final EFOC claim. Dkt No. 49-9 at 1-2. Eldeco's summary indicates a total EFOC claim of $269,814.59 but acknowledges that $46,537 of that total had been paid under Change Order No. 5. Thus, the total additional EFOC then sought was $223,277.59.[9]

LPS considered Eldeco's resubmitted EFOC claim, but the parties were unable to reach agreement on the amount due. *See* Fletcher aff. ¶ 13. In his affidavit, Fletcher explained that he "carefully examined the resubmitted claim, which was approximately 300% greater than the original claim, and contained many charges not related to Eldeco's extended overhead for the Project." *Id.* His affidavit does not suggest that the inability to reach agreement was based on any complete bar to recovery such as is now argued by Defendants.[10]

## DISCUSSION

### I. *QUANTUM MERUIT* CLAIM

---

[8] The problem with retainage apparently continued through October 3, 2007, after completion of the project, when Eldeco wrote the Owner's representative directly on this concern noting that LPS had agreed to a joint payment. Dkt. No. 49-10 at 34-35.

[9] The complaint indicates that Eldeco is seeking $276,945.24 in EFOC. However, Eldeco has reduced this demand through its response to Defendants' motion for summary judgment to $223,277.59. Thus, the amount now sought is consistent with the amount reflected in the August 2007 calculation. As discussed below, however, it ignores Eldeco's admitted receipt (apparently after suit was filed) of payment for all amounts due through Change Order No. 6. *See supra* n.2, *infra* § II.C.

[10] Defendants have cited several pages from Fletcher's deposition relating to this and other subject matters but have failed to provide those deposition excerpts to the court. To the extent the cited pages overlap with Plaintiff's submissions, they have, nonetheless, been considered.

Eldeco's claim for EFOC for expenses incurred due to delay is pursued, alternatively, under a contract theory and a *quantum meruit* theory. The latter theory is not, however, available, even on an alternative basis, because it is undisputed that the relationship and work out of which the claim arises is the result of an express contract between Eldeco and LPS. Not only is that contract express and binding, but it is detailed and written and purports to be the complete agreement of the parties.

For these reasons, the court concludes that Eldeco's right to recovery of EFOC arises in contract and cannot be maintained under a *quantum meruit* theory. *See Swanson v. Stratos,* 564 S.E.2d 117, 120 (S.C. Ct. App. 2002). As explained in *Swanson*: "If the tasks the plaintiff is seeking compensation for under a quantum meruit theory are encompassed within the terms of an express contract which has not been abandoned or rescinded, the plaintiff may not recover under quantum meruit." *Id.* (quoting 66 Am.Jur.2d *Restitution and Implied Contracts* § 81 (2001) ("[I]t is a defense to an action in quantum meruit that there is an express contract covering the issue of compensation for services or materials furnished."))[11]

The South Carolina Supreme Court's decision in *Franke Assoc. by Simmons v. Russell*, 368 S.E.2d 462 (S.C. 1988), on which Eldeco relies, does not support a different result. This is because the parties in that case disagreed as to whether there was an agreement for the performance of the work at issue. *Id.* at 465 (noting that the evidence was sufficient to allow a jury to reach either of two opposing conclusions as to whether there was an "express written or agreed-upon price for renovations"). Here, by contrast, there is no dispute that all of Eldeco's work was performed under an express contract which remained in effect throughout the relevant period. What is in dispute is not whether the work was covered by an express contract, but whether that contract allowed for the

---

[11] Any suggestion that the Subcontract does not extend to these claims is belied by Eldeco's pursuit and receipt of partial recovery for EFOC through two change orders.

10

recovery of EFOC in the event of delays in performance of the work. Thus, the dispute is one which turns on contract interpretation, not one which allows either party to disregard the contract and pursue a claim in *quantum meruit*.[12]

## II.  CONTRACT CLAIMS FOR WORK PERFORMED AND EFOC

### A.  Partial Abandonment of Claim for Damages

Through its response to the motion for summary judgment, Eldeco has voluntarily limited its claims to $16,956.68 as to the claim for work done under the contract and $223,227.59 for the EFOC claim.[13] To the extent the complaint suggests any greater amounts are sought, such claims have been abandoned and Defendants are entitled to judgment that no greater amount may now be recovered.

### B.  Absence of Evidence of Claim for Work Performed

Eldeco's claim that it is still owed $16,956.68 for work performed is inconsistent with its responses to request for admission and with concessions made by its Rule 30(b)(6) witness (Zeron) that Eldeco has been paid a total equal to the amounts shown in all change orders including Change Order No. 6. Although two of these change orders relate to EFOC, Eldeco's admission that it has received the cumulative total shown on Change Order No. 6 necessarily encompasses an admission

---

[12] It is notable also that the parties initially addressed and temporarily resolved Eldeco's EFOC claims through execution of change orders to the Subcontract. This confirms an understanding that the Subcontract controls the availability of EFOC.

[13] In referring to sums due for "work performed," the court refers to the contract payment required by the Subcontract as modified by those change orders which relate to changes in the scope of work. This, presumably, includes only the first four change orders as the fifth and sixth change orders relate to claims for EFOC. Reference to claims for EFOC, conversely, refers to Eldeco's claims based on delay in the completion date as evidenced, primarily, by the summary Eldeco prepared on or after August 24, 2007. Dkt. No. 49-9 at 1-2. That document reflects a total claim of $269,814.59, and prior payment of $46,537 under Change Order No. 5, leaving a total of $223,227.59 still being sought.

11

that Eldeco has received all due under the Subcontract as modified by the first four change orders. Thus, Eldeco's admissions preclude an argument that it is still owed any amount for work performed (as distinguished from the EFOC claim).

The only arguably contrary proffer of "evidence" is Eldeco's single unverified interrogatory response stating that it is still owed $16,956.68 for work done. For reasons argued by LPS, the unverified interrogatory response is inadequate to constitute a proffer of admissible evidence. Even were it acceptable as such, it would be insufficient because "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984).[14]

For these reasons, the court concludes that there is no evidence to support Eldeco's claim that any amounts remain owing for work performed. LPS is, therefore, entitled to judgment as a matter of law that Eldeco is not entitled to any additional sums for work performed.

### C. Limitation of EFOC Claim

It also appears that Eldeco's EFOC claim should be further limited based on payments Eldeco concedes it has received (some, apparently, after commencement of this action). As noted above, after completion of the project, Eldeco calculated its total EFOC claim as $269,814.59, but acknowledged that $46,537 of this amount had been paid through Change Order No. 5. This left a claim of $223,277.59 which corresponds with the amount Eldeco now asserts is due.

It would, however, appear that the amount now sought should be further reduced by the $43,029.46 paid under Change Order No. 6, as that change order relates solely to an additional "partial settlement" of Eldeco's EFOC claim. Assuming this is correct, the maximum recovery

---

[14] Eldeco offers no explanation as to the basis of its current claim that money is still owing for work done. Thus, there is no basis on which the court might reconcile this claim with Eldeco's earlier contrary admissions.

Eldeco might receive for its EFOC claim would be $180,248.13. The court will not, however, resolve this issue at this time as neither party has addressed this point. Therefore, the court only considers Eldeco's EFOC claim up to the amount of $223,277.59.

**D.    Waiver**

LPS also argues that Eldeco waived any claim for EFOC by signing the March 28, 2006 lien waiver. This conclusion is not supported by the present record for several reasons. First, because no date is specified on the waiver form (this space being left blank), it is not clear what period is covered by the waiver. Second, the terms of Change Order No. 5, which was executed on February 14, 2006, reserve resolution of the EFOC claim until after the project is completed. It seems unlikely that Eldeco would have intended or understood the March 28, 2006 waiver to bar pursuit of an issue which had just recently been reserved for resolution until a date which clearly had not arrived by the time of execution of the waiver. Even if the waiver was effective to bar some portion of Eldeco's claim, that bar would, necessarily, only cover claims arising before the waiver was signed, not claims based on the continued delay of the project from the date of the waiver (March 28, 2006) until Eldeco left the job site (August 7, 2007).

An additional difficulty with Defendants' position is presented by Change Order No. 6. This Change Order was prepared and partially executed nearly a year after the waiver was signed (dated March 4, 2007, and signed by Zeron on March 9, 2007), has been conceded as valid by Fletcher, and was apparently paid by one or both Defendants after this action was instituted. These actions are inconsistent with Defendants' argument that the March 28, 2006 waiver bars any claim for EFOC. Moreover, Change Order No. 6, like Change Order No. 5, indicates it is only a partial settlement of the EFOC claim and it reserves resolution of the total EFOC claim until the project is complete. Collectively, these facts preclude any finding on motion for summary judgment that Eldeco has

13

waived its claim for EFOC.

### E.   Contractual Limitations on Recovery of EFOC

LPS argues that "[n]either the Subcontract nor the Contract Documents provide for recovery by Eldeco of its EFOC claim." Dkt. No. 49-2 at 9 (asserting that the "Subcontract and General Contract are unambiguous concerning what claims are available to Eldeco"). LPS relies most particularly on a provision of Article 16 of the Subcontract which, as amended by the Rider, provides that Eldeco may not seek recovery "for additional payment or extension of time for performance of the work" absent a written change order. LPS then argues that Change Order No. 5 is not such a change order given that it recognized merely a temporary settlement of a maximum claim as asserted at the time. In addition, LPS argues that Change Order No. 5 is not supported by consideration because Eldeco was able to obtain this change order only by threatening not to perform work it was already obligated to perform. None of these arguments is sufficient to support summary judgment.

First, the nature and basis of the "threats" made by Eldeco at the time Change Order No. 5 was executed are in dispute. Even assuming the threats were based, at least in part, on Eldeco's insistence on recovery of EFOC, the threat would not clearly be inappropriate given that the contract (even as interpreted by LPS) allows for recovery of additional amounts *if a change order is executed*.

The Subcontract does not, in any event, bar a claim for EFOC as clearly as LPS suggests. Article 16, on which LPS primarily relies, is quoted below (as modified by the Rider):

**ARTICLE 16:   CLAIMS ACKNOWLEDGMENT**

SUBCONTRACTOR acknowledges Article 15 regarding changes in Work and hereby agrees that absent a written agreement, signed by CONTRACTOR, changing the scope of work or authorizing additional payment outside of this Lump Sum

14

Subcontract Agreement, there is no claim or basis for creating a claim for additional payment or extension of time to perform the work. SUBCONTRACTOR agrees that the absence of written authority shall constitute a complete defense for CONTRACTOR against having to make any extras or claims payments to SUBCONTRACTOR.

Dkt. No. 49-8 at 11 (Subcontract, Art. 16), 32 (Rider modifications to Art. 16 ).

This provision does not expressly bar claims for EFOC. Instead, it appears to allow such a claim *if supported by a change order.* If such an interpretation is given, it follows that the contract did not bar Eldeco from seeking such a change order when the project schedule extended far beyond that set out not only by the original Substantial Completion date for the Project but also in any change order approving extension of that date.[15] That LPS agreed to such a change order, not once, but twice, is at least some evidence in favor of this interpretation.

LPS also refers to Articles 10 and 11. Neither of these sections, however, includes any language which would bar recovery of EFOC. Instead, Article 10 speaks primarily to remedies which might be had *against* Eldeco should it cause delay:

**ARTICLE 10: CONTRACT TIME**

<u>Time is of the essence in the performance of this Subcontract.</u> SUBCONTRACTOR is aware of the Contract Time and agrees to take any and all steps necessary to ensure that the Work is performed in such time as to permit CONTRACTOR to perform the Work in accordance with the Project Schedule. If SUBCONTRACTOR fails to maintain the progress according to the Project Schedule, SUBCONTRACTOR agrees, at its sole cost and expense, to take any actions deemed by CONTRACTOR to be necessary to maintain the Project Schedule. In lieu of invoking Article 23 of this Subcontract, CONTRACTOR, at its option, may require SUBCONTRACTOR to provide for any of the following at no additional expense

---

[15] The record evidence does not support Defendants' argument that Eldeco's EFOC claim is barred because modifications to the Contract's Substantial Completion date were incorporated into the Subcontract. This argument relies on the implied but unsupported factual premise that the Contract's Substantial Completion date was, ultimately, extended into August 2007. Given this failure of evidence, the court need not address what, if any, impact such an extension would have on Eldeco's claim for EFOC.

15

> to Contractor: [listing various means for increasing the rate of progress].
>
> If SUBCONTRACTOR's progress remains unacceptable . . . CONTRACTOR may invoke Article 23 of this Subcontract. SUBCONTRACTOR shall be liable for [specified categories of damage caused by Subcontractor's delay].

Dkt. No. 49-8 at 7 (Subcontract, Art. 10), 31 (Rider modifications to Art. 10 ).

Similarly, Article 11, as rewritten by the Rider, has little bearing on the present dispute because it addresses extensions of time which might be granted to Eldeco for completion of its work.

> **ARTICLE 11:   DAMAGES FOR DELAY OR HINDRANCE**
>
> Time of completion of Subcontractor's Work shall [be] extended by Change Order, but only to the extent that such extensions are obtained by Contractor from Owner provided that Contractor submitted such requests promptly and in accordance with the provisions of the Project Documents.

Dkt. No. 49-8 at 8 (Subcontract, Art. 11), 31-32 (Rider modifications to Art. 11 ).

Though not mentioned by either party, the Rider's complete replacement of Article 11 may be of some relevance given that the stricken language would have expressly barred a claim for EFOC. The stricken language read, in relevant part, as follows:

> CONTRACTOR shall not be liable to SUBCONTRACTOR for any damages or additional compensation as a consequence of delays, hindrances, interferences or other similar events caused by an act or omission of CONTRACTOR or others. SUBCONTRACTOR's sole and exclusive remedy for delay . . . shall be an extension of time for performance of SUBCONTRACTOR's Work, only for reasons as provided in the Contract documents.

Dkt. No. 49–8 at 8 (Subcontract, Art. 11 without modifications required by Rider).

16

Plaintiff, in contrast, relies on Article 9 which incorporates the Project Schedule. As modified by the Rider, this Article reads, in relevant part, as follows:

ARTICLE 9: PERFORMANCE OF THE WORK

   A. SUBCONTRACTOR agrees to commence performance of the Work and to continue to perform the work until completion so that SUBCONTRACTOR shall meet the mutually agreed Project Schedule for completion of the Project in accordance with the Contract Documents hereafter referred to as the Project Schedule. SUBCONTRACTOR shall commence performance of the Work on the date and time specified by Project Schedule and shall continue to proceed in accordance with requirements of the Project Schedule.

   B. SUBCONTRACTOR shall promptly provide CONTRACTOR with scheduling information requested. CONTRACTOR shall prepare the Project Schedule and may by mutual agreement revise such schedule as necessary as the Work progresses. SUBCONTRACTOR shall comply with instructions given by CONTRACTOR, including any to suspend, delay or accelerate the Subcontract Work. SUBCONTRACTOR must notify CONTRACTOR in writing within seven (7) days of the beginning of any event causing delay, acceleration, or hindrance.

Dkt. No. 49-8 at 6 (Subcontract, Art. 9), 31 (Rider). It may be of some note here that the modifications required by the Rider included changing reference to the "Owner's and Contractor's" Project Schedule to "the mutually agreed" Project Schedule and several similar changes.

LPS appears to argue that it satisfied any obligations which may have been imposed on it by Article 9, and EFOC is, consequently, barred from recovery, because all delays became part of the Project Schedule. The factual premise for this argument is not, however, supported by the record given that the latest approved Substantial Completion date was in April 2006, not in August 2007, well before the actual project completion date. Thus, even accepting LPS's interpretation of this provision would not provide a complete bar to Eldeco's claim (although it might result in a reduction of the period for which an EFOC claim might be made). Given the lack of a factual basis for LPS's interpretation, the court need not resolve at this stage how the contract should be interpreted.

17

## SUPPLEMENTAL PRETRIAL BRIEFING

The conclusions reached above dispose of all claims other than the claim for EFOC and limit the amount recoverable under that claim to a maximum of $223,227.59. While resolution of the EFOC claim appears to present at least some issues of fact requiring jury resolution, there may also remain some matters for resolution by the court. To facilitate preparation for trial, the court requests further briefing on the following inquiries. **These inquiries shall be addressed in the form of a supplement to the Fed. R. Civ. P. 26(a)(3) responses and shall be due under the schedule set out below.**[16]

1. Specify the issues remaining for resolution through trial, indicating which should be presented to the jury and which may be resolved by the court.

2. To the extent any of the issues for trial require construction of the subcontract: (a) specify the contractual provisions at issue (providing the text as modified by the rider); (2) indicate the construction sought for each such provision; (3) set forth the factual and legal basis for the requested construction; and (4) indicate whether the requested construction presents any jury issues (specifying what those issues may be).

3. In the event that the court or a jury conclude that EFOC may be recovered, specify the amount, if any, which remains due and explain how that amount is calculated.

## PRETRIAL SCHEDULE

Because one or more claims survive the motion for summary judgment, the court modifies the pretrial schedule as set out below. Related instructions remain as set forth in the scheduling order entered June 16, 2009. Dkt. No. 40. **The court has accounted for the holidays in setting**

---

[16] Defendants may file their response jointly.

**this schedule. Counsel should not, therefore, anticipate further extensions of these deadlines.**

1. Mediation shall be conducted no later than **December 22, 2009**. *See* Dkt. No. 54.

2. Fed. R. Civ P. 26(a)(3) disclosures **and the supplemental briefing referenced above** shall be filed and served no later than **January 12, 2010**.

3. Objections and counter designations as well as any **response to the supplemental briefing** shall be filed and served no later than **January 26, 2010**.

4. The parties shall meet for the purpose of exchanging and marking exhibits no later than **February 2, 2010**.

5. Motions in limine shall be filed no later than **February 8, 2010**.

6. Pretrial briefs shall be filed no later than **February 12, 2010**.

7. Jury Selection is set for **February 19, 2009**.

## CONCLUSION

For the reasons set forth above, the court grants Defendants' motion for summary judgment as to Eldeco's *quantum meruit* claim, and any claim for work performed. The court denies the motion as to Eldeco's contract-based claim for extended field overhead costs, although that claim is limited based on Eldeco's concession to $223,277.59. The contract claim as so limited shall proceed under the schedule set forth above.

IT IS SO ORDERED.

                                               s/ Cameron McGowan Currie
                                              CAMERON MCGOWAN CURRIE
                                              UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
December 1, 2009